Filed 6/5/26  In re A.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. ANTONIO S. et al., Defendants and Appellants. | E087434 (Super.Ct.No. RIJ1301021) OPINION |

APPEAL from the Superior Court of Riverside County.  Sean P. Crandell, Judge.

Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant, Antonio S.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant, T.A.

1

Minh C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Larisa R-McKenna, Deputy County Counsel, for Plaintiff and Respondent.

T.A. (Mother) and Antonio S. (Father) appeal from the juvenile court's order terminating parental rights to their son, A.S. (Welf. & Inst. Code, § 366.26, subd. (c)(1); unlabeled statutory references are to this code.) Mother contends that the court violated her due process rights by failing to follow the necessary procedures for appointment of a guardian ad litem. Father joins. Father also argues that the court failed to discharge its duty of initial inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related state law. We agree with both claims of error, but we conclude that the errors were harmless. We therefore affirm.

BACKGROUND

I.    *Referral and detention*

In November 2023, the Riverside County Department of Public Social Services (DPSS) filed a petition under section 300, alleging that A.S. (then five days old) and his older half brother E.P. were at risk of serious physical harm. (E.P. is not involved in this appeal.) The petition alleged that Mother (1) had a history of using methamphetamine, including while she was pregnant with A.S., (2) had unresolved mental health issues, (3) did not receive prenatal care during her pregnancy with A.S. or secure necessary provisions for his care, (4) had a criminal history, and (5) had a child welfare history that includes the termination of her parental rights to two older children. The petition alleged

2

that Father had a history of abusing controlled substances including methamphetamine, and he neglected the health, safety, and well-being of A.S.

According to the detention report, Mother gave birth to A.S. in November 2023. She had been diagnosed with several conditions, including bipolar disorder, panic disorder, posttraumatic stress disorder, and psychosis. She admitted using methamphetamine while she was pregnant with A.S., and she reported that she had a history of involuntary holds under section 5150. She had been having visual and auditory hallucinations and hearing "voices telling her mean things." She had "extreme paranoia," and the nurse at the hospital said that she "was concern[ed] about [Mother's] mental health." Father had not been to the hospital since A.S. was born. Father had a criminal history that included convictions for possession of controlled substances and domestic violence.

Two days after A.S. was born, DPSS tried to place him in protective custody, and Mother "became irate" and refused to let A.S. go. Law enforcement intervened, and DPSS "was able to safely leave with" A.S.

At the detention hearing, the court detained A.S. from both parents. The court also ordered that Mother have no visitation, finding that it would be detrimental to A.S.

II.     *Jurisdiction and disposition*

In DPSS's jurisdiction and disposition report, the social worker reported that Mother said that she was staying in hotels with Father. Mother could not "understand

why [she could not visit A.S. because] she ha[d] done nothing but be an attentive, loving, [and] caring mother."

On the date originally set for the jurisdiction hearing in January 2024, the court authorized visits for Mother twice per week for one hour. Later that month, Father made his first appearance in court and requested a paternity test.

In February 2024, DPSS received the results confirming that Father was A.S.'s biological father. DPSS reported that Father was incarcerated, and Mother did not "appear to have made progress with her mental health." DPSS was concerned about Mother because in prior criminal proceedings she was declared incompetent and was committed to a state hospital after stabbing the maternal grandmother.

Mother subsequently reported that she was six weeks pregnant and being "held against her will." She told DPSS that she was homeless, did not know where she was, and wanted to kill herself. She said that "she went to a hospital and signed papers because she didn't have anywhere to go."

After Mother was released from the hospital, she went to DPSS's office to review her case plan. She "spoke slowly and lolled her head around and tapped the table with one finger as she spoke each word." Mother asked where Father was, and DPSS told her that he was in prison. Mother confirmed a scheduled visit with A.S., but she did not show up for it. She called approximately two weeks later and told DPSS that she was in the hospital and could not attend her visits. Mother said that she had gone to the post office, and "the next thing she knew," she was back in the hospital.

Mother had a visit with A.S. on April 25, 2024. She engaged with him, held and fed him, and played with him. She changed his diaper but did not wipe him. DPSS reported that she "ha[d] to be directed to hold [A.S.] at an angle or upright to feed him, wipe his chin and to burp him."

Mother had another a visit with A.S. in early May 2024, and she asked to end the visit early when she was unable to console him. The following week, Mother arrived late to her visit with A.S. She told DPSS that she was taking her medication, but she had "been having difficulty the past few days" with her feelings toward others and did not know if she could control herself. She said that she was considering visiting A.S. for just one hour instead of two hours because of her anxiety and "social concerns," but she reconsidered because she "miss[ed] him and love[d] him." Mother cancelled the next visit because "she did not feel right." At Mother's make-up visit two days later, A.S. "screamed and cried for over 15 minutes and could not be consoled by [Mother]."

On May 31, 2024, the court conducted a contested jurisdiction and disposition hearing. The court sustained the petition, reduced Mother's visitation to once per month for one hour, and continued the disposition hearing to July 2024.

At the continued disposition hearing, the court bypassed reunification services for both parents and set a selection and implementation hearing.

III.    *Section 366.26 hearing*

In August 2024, DPSS placed A.S. with paternal aunt C.B. In November 2024, DPSS reported that Mother "ha[d] not had a visit with [A.S.] during the review period,

due to [her] not making herself available." A.S. had "created a strong family bond with his paternal aunt and cousins in the home. The paternal aunt continue[d] to provide [A.S.] with a loving, nurturing, and stable home environment to thrive and meet his specific needs." C.B. wanted to adopt A.S.

In March 2025, DPSS filed an addendum report. Mother told DPSS that she did not have a permanent address, because she and Father were "always moving homes." She did not have a contact number, and she told DPSS that the best way to reach her was to call Father. The following day, DPSS called Father, and it "went straight to voicemail."

In May 2025, DPSS reported that C.B was meeting all of A.S.'s needs. A.S. was receiving care and love in the home, and the family was "excited and motivated to move forward with the next step of adopting [him]."

Mother was 50 minutes late to her April 2025 visit, and she "demanded to reschedule another visit for the month." DPSS reminded Mother that visits would be cancelled if Mother was 15 minutes late and that she was expected to arrive early to her visits to complete a saliva drug test.

In July 2025, hospital staff reported to DPSS that Mother was at the hospital, 35 weeks pregnant, and homeless. She was placed on a section 5150 hold for grave disability. She was unable to have a "meaningful conversation," and she reported that "unknown people keep stealing her money." Mother said that she had no "mental

6

history," did not take medication, and was her own therapist. After giving birth, she refused to give the baby to DPSS and fled the hospital with the infant.

DPSS took the infant into protective custody and subsequently placed him in C.B.'s home. At the detention hearing on August 6, 2025, Mother's counsel asked the court to appoint a guardian ad litem for Mother, and the court, the prospective guardian ad litem, and Mother engaged in the following colloquy:

"THE COURT: Did you explain to her what the guardian—or did either you or [Mother's counsel] go over the guardian ad litem and what it entails?

"MS. ANDREWS: I did explain to her what a guardian ad litem does and what my role would be, and she agreed to have me as her guardian ad litem and assist [her attorney].

"THE COURT: All right. Is that correct, Mom?

"THE MOTHER: Can you read that, please.

"THE COURT: Sure. Did your attorneys, [Mother's counsel] and Ms. Andrews, talk to you about me appointing Ms. Andrews to assist you as a guardian ad litem?

"THE MOTHER: That's fine.

"THE COURT: They did?

"THE MOTHER: Yeah.

"THE COURT: And is that something that you understood what they told you?

"THE MOTHER: Completely.

7

"THE COURT: Do you want me to appoint Ms. Andrews to assist as your guardian ad litem?

"THE MOTHER: That's fine by me.

"THE COURT: I did read [DPSS's] reports. I do believe that would be appropriate given the circumstances of this matter. [¶] And so, Ms. Andrews, you are formally appointed in the capacity of guardian ad litem on behalf of mother."

On August 19, 2025, at the continued section 366.26 hearing, the court heard argument regarding a section 388 petition that Mother had filed asking for reunification services. The court took the matter under submission and continued the hearing to October 2025.

At the continued section 366.26 hearing, the court denied Mother's section 388 petition. Mother's counsel then asked the court not to terminate parental rights, because the "sibling exception applies." The court found that termination of parental rights would not be detrimental to A.S. and that none of the exceptions to termination were applicable in this case, and it accordingly terminated parental rights.

IV.  *ICWA-related background*

In December 2023, DPSS reported that it had called Father to ask about Indian ancestry, but he did not answer and his voicemail was not set up.[1] DPSS asked the paternal grandmother, who said that she had Cherokee ancestry and that the paternal

---

[1]    Because ICWA uses the term "Indian," we use it as well "to reflect the statutory language." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*).)

grandfather was "from the Blackfoot tribe." She denied knowing whether any relative ever lived on an Indian reservation or ever received education or medical services from the Bureau of Indian Affairs (BIA) or from a tribe. DPSS tried to call Father two more times in December 2023 and did not receive a response. DPSS spoke with Mother, who said that she was living with Father, but Father would not talk to the social worker. Paternal aunt C.B. and the paternal uncle denied having Indian ancestry.

At a hearing in December 2023, paternal aunts C.B. and C.S. denied knowing of any Indian ancestry. The paternal grandmother told the court that "[t]here is Indian all in our blood. As for as documented, I don't know, but I was always told." She said that she knew there was "Cherokee" and that "his dad is BlackFoot. There is several. I just don't know." The paternal grandmother told the court that her sister might have more information, but her contact information was never given to DPSS. The court found that ICWA may apply, and it ordered DPSS to conduct further inquiry.

In January 2024, DPSS sent a letter by email and certified mail to the Cherokee tribes, the Blackfeet tribe, and the BIA. It included the names and dates of birth for the parents, the paternal grandparents, the maternal grandparents, and the maternal great-grandparents. In August 2024, after Mother claimed Choctaw ancestry, DPSS sent an inquiry letter with the same information to the Choctaw Nation of Oklahoma, the Jena Band of Choctaw Indians, and the Mississippi Band of Choctaw Indians. The letters asked the tribes to "indicate if additional information [was] needed" "to make a membership and/or eligibility determination."

9

The Cherokee Nation, the Eastern Band of Cherokee Indians, the United Keetowah Band of Cherokee Indians, and the Blackfeet Nation responded that A.S. was not an Indian child. At a hearing in May 2024, the court found that adequate ICWA inquiry had been made and that ICWA did not apply.

In August 2024, the Choctaw Nation of Oklahoma, the Jena Band of Choctaw Indians, the Mississippi Band of Choctaw Indians, and the Blackfeet Nation responded that A.S. was not an Indian child. DPSS filed the responses with the court in September 2024.

In March 2025, the paternal grandmother and a paternal aunt denied Indian ancestry. In August 2025, Father filed Judicial Council form ICWA-020, on which he denied Indian ancestry.

## DISCUSSION

I. *Appointment of a guardian ad litem*

Mother argues that the court's appointment of a guardian ad litem violated her right to due process because the court did not follow "proper appointment procedures." We agree that the court erred by failing to follow the required procedure, but we conclude that the error was harmless.

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. [Citations.] The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist

counsel in preparing the case. [Citations.]" (*In re James F.* (2008) 42 Cal.4th 901, 910 (*James F.*).)

"The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem." (*James F.*, *supra*, 42 Cal.4th at p. 910.) "Thus, the appointment vitally affects the parent's interest in the companionship, care, custody and management of her or his children, one of the most basic of civil rights." (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1187.)

"Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. [Citation.] The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. [Citation.] If the parent consents to the appointment, the parent's due process rights are satisfied. [Citation.] A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent. [Citation.] If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence. [Citation.]" (*James F.*, *supra*, 42 Cal.4th at pp. 910-911.)

The court in this case held a hearing at which it asked Mother and the guardian ad litem whether the guardian ad litem or Mother's counsel explained what a "guardian ad litem [is] and what it entails." The guardian ad litem said that she had explained her role

11

to Mother, and Mother confirmed that she understood. But no one explained the guardian ad litem's role to Mother or the grounds for believing that Mother was mentally incompetent on the record. The court relied entirely on the guardian ad litem's representation that she had explained the nature and purpose of a guardian ad litem to Mother. That was error. The juvenile court had no idea what explanation was provided to Mother, and we likewise have none.

Even though Mother said that the appointment of the guardian ad litem was "fine by [her]," "there is nothing further in the record to indicate that the significance of the appointment was ever explained" to her, "that she understood the nature of what was being asked of her," "or that she understood the rights she was giving up by agreeing to the appointment of a guardian." (*In re Joann E.* (2002) 104 Cal.App.4th 347, 355-356 (*Joann E.*).) "[C]lear explanations of these matters are required to provide adequate process to a parent for whom a guardian ad litem is being appointed in a dependency proceeding." (*Id*. at p. 356.) Mother's agreement was therefore insufficient to establish that she consented to the appointment of the guardian ad litem. (*Ibid*.)

The juvenile court's error is not reversible, however, unless it was prejudicial. "[A] juvenile court's violation of a parent's due process rights in a dependency proceeding may be deemed harmless '[i]f the outcome of a proceeding has not been affected' by the violation." (*In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 93.) The relevant outcome is not the appointment of the guardian ad litem but rather the result of subsequent hearings, such as review hearings or the section 366.26 hearing. (*Ibid*.) "We

12

will assume, without deciding, that the harmless beyond a reasonable doubt standard of review is applicable in this case …." (*Id*. at p. 94.)

Mother's appellate briefs do not address the issue of prejudice, so we could deem it forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408, 410.) But we exercise our discretion to address the issue on the merits, and we conclude that the court's error was harmless beyond a reasonable doubt.

The court held two hearings after appointing the guardian ad litem. The first occurred on August 19, 2025. Mother had filed a section 388 petition asking the court for reunification services. At the hearing, Mother's counsel argued that circumstances had changed. The court took the matter under submission and continued the hearing to October 2025 to allow a further ICWA inquiry to be completed.

At the hearing in October 2025, the court denied Mother's section 388 petition because circumstances were "at most ... changing" but not yet changed and it would not be in A.S.'s best interest to grant Mother reunification services. The court then heard argument regarding the termination of parental rights. Mother's counsel argued that the court should find that the sibling relationship exception to the termination of parental rights applies. The court found that none of the exceptions applied, and the court terminated parental rights.

We are persuaded beyond a reasonable doubt that Mother would not have obtained a more favorable outcome at either hearing absent the error in the procedure by which the guardian ad litem was appointed. Mother was bypassed for reunification services in July

13

2024 because her parental rights had previously been terminated as to two older children. The record contains ample evidence that Mother was severely mentally ill throughout the entire case, and the record contains no evidence that she was making substantive progress in treatment. She was placed on two involuntary holds, was homeless as of March 2024 and July 2025, said that she had "no mental history" and "did not take any medication," and fled the hospital with her newborn baby. Moreover, she had virtually no relationship with A.S. A.S. was removed from her care when he was two days old, and she visited him inconsistently. At the time of the section 366.26 hearing, A.S. was almost two years old, had been living in C.B.'s home for nearly one year, and was thriving. A.S.'s newborn sibling had been placed with him in C.B.'s home just a few months earlier. Given all of those facts, we are persuaded beyond a reasonable doubt that the juvenile court would have denied Mother's section 388 petition and terminated her parental rights even if the court had followed the proper procedure for appointment of a guardian ad litem, or even if it had not appointed a guardian ad litem at all.

Mother also argues that the attorney who was appointed as her guardian ad litem suffered from a conflict of interest because she had previously "appeared on behalf of the children" in this case. It is true that the attorney in question stood in for the children's counsel at hearings on May 6 and May 7, 2024. Nothing substantive transpired at either hearing. At the first, all counsel acknowledged receipt of an amended petition, and the hearing was continued. At the second, the court ordered Father to be transported from state prison for the next hearing date.

14

Insofar as Mother is arguing that the attorney who became her guardian ad litem suffered from a disqualifying conflict of interest, we deem the argument forfeited. Mother's counsel was aware that the guardian ad litem had previously appeared on behalf of the children, and counsel never objected to the appointment. "A parent's failure to raise an issue in the juvenile court prevents him or her from presenting the issue to the appellate court." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.) Raising the issue in the trial court would have given that court the opportunity to inquire and determine whether the attorney had acquired any confidential information or otherwise been affected by the prior representation in a way that might be relevant to the attorney's appointment as Mother's guardian ad litem. Mother's failure to raise the issue in the trial court deprived the court of the opportunity to investigate and make a record of the relevant facts and to resolve any problems those facts might have presented. Moreover, the record before us gives us no reason to believe that the attorney in question acquired confidential information or was otherwise affected by the appearances at those two hearings in a way that would make her appointment as Mother's guardian ad litem problematic—both hearings were brief and nonsubstantive, the attorney's role (as a stand-in for the children's regular counsel) in both hearings was minimal, and the children were not present. For all of these reasons, we deem the issue forfeited.

II.     *ICWA initial inquiry*

Father argues that the court erred by failing to ask him whether he had Indian ancestry. We agree that the court erred, but the error was harmless.

15

The child welfare department and the juvenile court have an "affirmative and continuing duty to inquire" whether a child in a dependency proceeding "is or may be an Indian child." (§ 224.2, subd. (a).) The court's duty to inquire is governed by both federal and state law. "Federal regulations require state courts to ask each participant 'at the commencement' of a child custody proceeding 'whether the participant knows or has reason to know that the child is an Indian child.'" (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678-679, disapproved on another ground by *Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18 [quoting 25 C.F.R. § 23.107(a) (2022)].) Similarly, state law requires the court to pursue an ICWA inquiry at the first hearing on a dependency petition or at the first court appearance of a party or "other interested person[]," if the party or other interested person was not present at the first hearing. (§ 224.2, subd. (c).)

Father made his first appearance in court in January 2024, but the court did not ask Father about Indian ancestry. That was error. But the error was harmless because in August 2025, Father filed an ICWA-020 form denying Indian ancestry. The court obtained Father's answer regarding Indian ancestry through that filing, so the court's failure to ask Father at his first appearance had no effect on the proceedings.

DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

LEE
J.

17